IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| 4SEMO.COM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.   13-cv-297-DRH-SCW |
| | ) | |
| SOUTHERN ILLINOIS STORM | ) | |
| SHELTERS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

**WILLIAMS, Magistrate Judge:**

### INTRODUCTION

Four years ago, this matter began as a suit for trademark infringement brought by Southern Illinois Storm Shelters, Inc. ("SISS") against 4SEMO.com, Inc. ("4SEMO"). 4SEMO, in turn, filed a counterclaim, which is now all that remains.   Currently before the Court is a Motion for Judgment without Trial as Sanction for Spoliation of Evidence (Doc. 192) filed by now-Plaintiff 4SEMO.   4SEMO alleges that Defendants destroyed certain documents relating to sales and cost figures of certain infringing storm shelters, in violation of an order by the undersigned.   A Response and a Reply have been filed, and on November 17, 2016 an evidentiary hearing was held.   As such, Plaintiff's Motion for Judgment without Trial is ripe for disposition.   For the reasons articulated below, the undersigned **RECOMMENDS** that the district judge **GRANT in part and DENY in part** Plaintiff's Motion (Doc. 192).   Specifically, the undersigned **RECOMMENDS** that

the district judge impose a lesser sanction of prohibiting Defendants from opposing Plaintiff's evidence relating to its damages for infringement.

### FACTUAL AND PROCEDURAL BACKGROUND

**1. Procedural History**

It is unnecessary to get into the weeds of the somewhat tortured procedural history of this matter, and a general description of the procedural occurrences to this point will suffice.   4SEMO is a Missouri corporation that is in the business of dealing and installing storm shelters, as well as, providing general contracting work.   (Doc. 2, p. 3; Doc. 13, p. 2).   SISS, located in Benton, Illinois, manufactures, markets, and sells storm shelters.   (Doc. 14, p. 2; Doc. 24, p. 1).   Initially, SISS brought suit against 4SEMO for trademark infringement, alleging that 4SEMO infringed a mark known as "Lifesaver Storm Shelters" that belonged to SISS.   (Doc. 2, p. 2).   In response, 4SEMO filed a series of counterclaims, resulting in Ingoldsby Excavating, Inc. ("IEI") and Bob Ingoldsby d/b/a Bob Ingoldsby Construction being named as counterclaim defendants along with SISS.   (Doc. 78, p. 1).   4SEMO alleges that it is the owner of the Lifesaver Storm Shelter mark and that the counterclaim defendants, jointly, infringed its trademark.   (*See generally,* Doc. 78).   4SEMO seeks in relief, *inter alia*, actual damages, disgorgement of profits, and costs, pursuant to federal trademark law.   (*Id.* at 16).   In August 2015, District Judge Herndon granted in part a motion to dismiss filed by 4SEMO and dismissed Counts 3 through 7 of SISS's Complaint.   (Doc. 149).   Shortly thereafter, Judge Herndon granted summary judgment to 4SEMO on the remaining two counts of

SISS's Complaint.   (Doc. 150).   As such, this matter proceeds solely on 4SEMO's counterclaim, and the parties have been reordered, with 4SEMO as the Plaintiff and SISS and the Ingoldsby parties all as Defendants.   (Doc. 151).

## 2.   Factual Background Leading to the Motion at Bar

On October 8, 2014, the undersigned held a discovery dispute conference in this matter.   (*See* Doc. 98).   Part of the dispute concerned the production of documents evidencing sales and revenue from 4SEMO's alleged mark that were encompassed in Plaintiff's Requests to Produce. (Doc. 201-1, requests 9, 10, 11, 21, 26).   In advance of the conference the parties exchanged correspondence concerning the subject of this dispute. It is clear from that correspondence that the Defendants had explained to the Plaintiff that there were documents representing "orders" that were "discarded." (Plaintiff's Exhibit 25, p. 1). The correspondence maintained that, generally, orders were placed by call or by fax.   (*Id*.).   As it related to the documents that constituted "invoices" however, those documents were printed from Quickbooks and sent to the respective dealer without a hard copy of the invoice being retained.   (*Id.* at 2).   Nonetheless, a electronic record was retained in Quickbooks.   (*Id*.).

In its letter brief submitted to the Court prior to the conference, 4SEMO stated that while it had received printouts of Defendants' Quickbook reports, it had received only a limited number of underlying invoices and purchase orders that would be input into Quickbooks.   (Plaintiff's Exhibit 31, p. 2, 5).   In fact, 4SEMO indicated that Defendants had destroyed underlying invoices, purchase orders, and "other sales

related documents". (*Id.* at 2). In their letter response Defendants acknowledged that the standard practice for SISS and IEI was to destroy the underlying "source documents" once the documents' information had been input into the computer by Scott Ingoldsby. (Plf. Ex. 30, p. 2). This was also consistent with Scott Ingoldsby's testimony concerning his practices relating to Quickbooks invoices generated for IEI. (Pl. Ex. 85, p. 13 – 15). Defendants claimed that due to the limited resources of the companies, keeping hard copies of the documents was "impractical". (*Id.*). In the letter, counsel for Defendants, Evan Taylor, stated that the Defendants' attorneys would work with SISS and IEI "to ensure they develop a system for storing source documents relevant to this litigation for the pendency of the proceedings." (*Id.*). Additionally, it was represented that SISS and IEI would request "source documents" from any dealers with which the companies did business. (*Id.*). Attached to the letter brief was a form letter to the dealers. (*Id.* at 6). The form letter includes the following statement:

> One issue that has arisen in discovery is that SISS discards all source documents (e.g. purchase orders, invoices, etc.) after entering them into the electronic database.

(*Id.*). The form letter goes on to request that the dealer

> provide any source documents you may have regarding purchases of storm shelters or any other business dealings with SISS since the date 4SEMO filed its Counterclaim, May 29, 2013, to the present.

(*Id.*).

At the October 2014 conference, the Court reminded the Defendants of their continuing obligation to supplement their discovery responses, even after compliance

with any discovery-related order entered by the Court.   (Doc. 218, p. 4 – 5).   It was also discussed that Defendants' accountant had to make corrections to certain Quickbooks reports, and Defendants indicated that the reconciliation was performed by referring to bank statements that were provided by the Defendants.   (*Id.* at 5 – 6, 9).   Though those bank statements had been destroyed by the Defendants, copies could be obtained from the bank, and the undersigned ordered the Defendants to obtain and produce those copies.   (*Id.* at 9).   There was also a separate extensive discussion at the conference surrounding the destruction of the "underlying documents" used to input data into Quickbooks.   Upon being asked by the Court as to whether there was any communication to Defendants asking them to preserve the underlying income and profit documents, counsel for Defendants, Alfred Sanders, testified as follows:

> I am just saying we did not tell them, to my knowledge, at any point in time.   We didn't know this was a problem until the discovery issue came up.   That is when, during that deposition, that they mentioned Mr. Ingoldsby making the comment there may be some of these documents and we asked him then at that time if he had them, we need them and do not be destroying anything else.   So that is when he was instructed to stop that practice is the first time we found out it was going on.

(*Id.* at 11).   The Court also sought Plaintiff's counsels' take on the matter:

> THE COURT:   Okay.   Now Mr. Kramer, you had asked for these documents prior to May of 2014 according to you?
>
> MR. KRAMER:   Yes, Your Honor.
>
> THE COURT:   What was the initial response?
>
> MR. TAYLOR:   The initial response was that we got copies of what appeared to be some sporadic purchase orders and invoices or shipping manifests or whatever which led us to believe that they were giving us

some, but not all.   That was one of the things we went back to them - - we were going back and forth trying to get the rest of them and it was only during the deposition that it became clear that what they had given us wasn't even actually copies of hard copy documents, but rather things that Scottie Ingoldsby had caused quickbooks to sort of print out anew.   So there wasn't really a copy of a historic document, but it was a newly generated document off of the software, which we had not realized.   Part of the problem, we were going back and forth for a long time thinking that we were getting more and additional copies because we had gotten what we thought were some.   We were not in any way - - we didn't realize they were being destroyed on our side until the deposition.   That's when he also came out and clarified, no, those aren't actually historic documents, we don't have any historic documents because we just routinely destroyed them.   We didn't realize either.

(*Id.* at 11 – 12).

Plaintiff's counsel also expressed concern that the bank statements that the undersigned ordered produced may not necessarily specifically show business receipts. (*Id.* at 14).   The undersigned agreed and issued the following order on the record:

> To the extent that there are any other documents that actually show more in the way of underlying sales, obviously those have to be produced if they are in existence….[C]ounsel has a duty, and at least the plaintiff[1]  [SISS] has a duty to consult with the accountant and find out what the accountant has, and to the extent it is discoverable, it has to be produced….

(*Id.*).   Defendants indicated that they would contact their dealers and attempt to gather as much of these documents from the dealers as possible.   (*Id.* at 15).   While the Court allowed for the sharing of costs of obtaining documents that preceded the filing of the lawsuit, the Court specifically ordered the Defendants to seek to obtain **all** available documents from their dealers.   (*Id.* At 15).   This order made on the record at the conference was memorialized in the Court's written summary order of the hearing.   (*See*

---

[1]  At that point, SISS was still the Plaintiff.

Doc. 99, p. 2).

Finally, at the conference, Plaintiff indicated that the main reason it wanted the underlying documents was due to a concern that the Quickbooks files were inaccurate, and Plaintiff also expressed concern that the Quickbooks files may have been altered. (*Id.* at 17).   As such, the undersigned ordered Defendants produce an image of the portion of the computer hard drive containing the Quickbooks files, and noted that the image would contain metadata that would allow Plaintiff's expert to determine if and when changes to the files had been made.   (*Id.* at 18).   At the conference, the Court also ordered the Defendants to produce, to the extent recoverable from providers, emails and text messages relevant to the litigation.   (*Id.* at 21 & 22; Doc. 99, p. 2).

Defendants provided the Quickbooks data to Plaintiff in November of 2014, but never supplemented their production with the underlying documents discussed at the conference.  (Doc. 221, p. 16).  They also failed to provide Plaintiff with an updated Quickbooks production after 2014.   (*Id.*).   Prior to filing the motion at bar, Defendants informed Plaintiff that the Quickbooks data had been corrupted due to a computer upgrade to the Windows 10 operating system.   (Doc. 199-1, p. 2).   This event was later corroborated at the hearing on the motion at issue by Judith Parr, Defendants' accountant.   (Doc. 221, p. 98 – 101).

On August 15, 2016, Plaintiff filed its Motion for Judgment without Trial (Doc. 192), and the undersigned held an evidentiary hearing on the motion.   As the basis for their motion, Plaintiff claims that Defendants have continued to destroy all of the

"historic documents and paper evidence which establishes the dates and quantities of sales of infringing products, revenues obtained from such sales and any costs they claim to have incurred in conjunction" with the sales. (Doc. 193, p. 1). Plaintiff's counsel indicated that the reason he did not bring this matter to the Court's attention sooner is because Defendants continuously promised to provide the discovery, and they "never said no". (Doc. 221, p. 17).

At the evidentiary hearing, counsel for Defendants contended that the documents to which they previously referred as having been destroyed were bank records, copies of which can be obtained from the bank. (Doc. 221, p. 31, 37 – 38, & 181). Counsel contended that nothing was being destroyed because, aside from the bank records, the only original documents—invoices—were printed from Quickbooks and mailed to the dealers. (*Id.* at 34 – 35, 37; Doc. 201, ¶ 20). Copies of the invoices mailed to the dealers were not made, however. (Doc. 221, p. 34, 35).

In response to Plaintiff's motion, Defendants submitted an affidavit of Scott Ingoldsby, who claims that most orders for storm shelters were simply taken "by phone (sometimes by text or email), entered into QB and then QB generates an invoice to the dealer." (Doc. 201-2, ¶14). While Scott Ingoldsby was not present at the evidentiary hearing, Robert Ingoldsby, owner of SISS, testified at the hearing. He stated that 70% of the orders from dealers were placed over the phone. (Doc. 221, p. 158). He further testified that some were also placed by text message, email, or fax, but that only corporate customers (comprising 10% of sales) would use written purchase orders. (*Id.*

at 159 - 60).   On cross examination, Mr. Ingoldsby testified that Ray Fielak from 4SEMO was the only dealer who sent in a written purchase order.   (*Id.* at 164).

Plaintiff's representative, Ray Fielak, testified that whenever he placed an order for a storm shelter from SISS, he did so in writing at the Defendants' direction.   (Doc. 221, p. 74).   He testified that while there were numerous times he called Defendants to give them a "heads up" that he would be placing an order, the defendants always instructed him to follow up with a written order, fax, or purchase order.   (*Id.*).   On cross examination, Mr. Fielak confirmed that he always placed purchase orders by fax. (*Id.* at 78).

Also testifying at the hearing were Plaintiff's expert forensic accountant, Mark Hoffman, and Defendants' business accountant, Judith Parr.   Of note, Mr. Hoffman testified that he did not examine the audit trail of the Quickbooks information he was provided to determine if there was ever any alteration of the data.   (Doc. 221, p. 96). For her part, Mr. Parr testified that she did the accounting for the Defendants on a "cash basis" and never saw purchase orders or sales invoices, etc.   (*Id.* at 104).   Rather, her work was done largely from bank statements provided by Defendants.   (*Id.*).

Defendants also indicated at the hearing that they would not seek to introduce evidence of their own costs when it came to assessing Plaintiff's recovery for disgorgement of profits.   (*Id.* at 31, 32).   Defendants state that Plaintiff did not request this information and Defendants did not produce it.   (*Id.*).   Finally, Defendants' conceded at the hearing that they continued to use the alleged infringing mark, and will

continue to do so unless and until a judgment tells them otherwise.   (*Id.* at 22).

LEGAL STANDARD

Plaintiff 4SEMO asks the Court to impose the sanction of a default judgment.   In doing so, 4SEMO invokes Rule 37 of the Federal Rules of Civil Procedure and also cites case law relating to spoliation.   While Defendants' actions may technically constitute spoliation, the undersigned views this issue as one primarily implicating Rule 37.   In fact a finding of spoliation on the part of the Defendants, alone, would not entitle 4SEMO to the relief it seeks.   *See Mathis v. John Morden Buick, Inc.*, **136 F.3d 1153, 1155 (7th Cir. 1998) (noting that the plaintiff's failure to seek Rule 37 sanctions for the destruction of evidence left the district court with only the ability to impose an adverse inference relating to the evidence)**.   As such, the undersigned views the matter as one for disposition through Rule 37.

Rule 37(b)(2) allows a court to impose certain sanctions against a party who "fails to obey an order" of the court "to provide or permit discovery".   **FED.R.CIV.P. 37(b)(2)**. Among the sanctions contemplated by the rule include disallowing the offending party from "supporting or opposing designated claims or defenses, or from introducing designated matters in evidence," as well as, entering a default judgment against that party.   *Id.* **at 37(b)(2)(ii) & (vi)**.

District Courts have broad discretion in selecting an appropriate sanction for a discovery violation.   *Barreto v. Citibank, N.A.*, **907 F.2d 15, 16 (1st Cir. 1990); 8B Wright & Miller,** *Federal Practice & Procedure: Federal Rules of Civil Procedure* **§ 2284**. An

imposition of sanctions, however, "must be proportionate to the circumstances surrounding the failure to comply with discovery." *Langley v. Union Elec. Co.*, **107 F.3d 510, 515 (7th Cir. 1997) (quoting** *Crown Life Ins. Co. v. Craig*, **995 F.2d 1376, 1382 (7th Cir. 1993)**. A court must look at the procedural history as a whole and "weigh not only the straw that finally broke the camel's back, but all the straws that the recalcitrant party piled on over the course of the lawsuit." *e360 Insight, Inc. v. Spamhaus Project*, **658 F.3d 637, 643 (7th Cir. 2011)**. A sanction that would result in a default judgment is appropriate "only where 'there is a clear record of delay or contumacious conduct'", *Domanus v. Lewicki*, **742 F.3d 290, 301 (7th Cir. 2014) (quoting** *Maynard v. Nygren*, **332 F.3d 462, 467 (7th Cir. 2003))**, where lesser sanctions have failed, *id*, or where the offending party has displayed "willfulness, bad faith, or fault." *Domanus*, **742 F.3d at 301 (quoting** *In re Thomas Consol. Indus., Inc.*, **456 F.3d 719, 724 (7th Cir. 2006)**.

## ANALYSIS

After careful review of the record, the undersigned finds that Defendants have engaged in sanctionable conduct. The evidence indicates that Defendants failed to preserve any underlying source documentation after October 2014. In fact, it is clear that they continued to engage in the same course of the conduct that they had engaged in prior to the October 2014 hearing. In doing so, the Defendants directly violated an order of the Court, and Defendants' assertion that the Court's October 2014 Order referred only to bank records is disingenuous. The record, highlighted above through the October 2014 transcript, as well as, letters drafted by *Defendants' own counsel*, indicate

that *in addition* to bank records, the documents that the Court ordered Defendants to produce included purchase orders, emails, and texts from dealers.  The Court also specifically advised Defendants of their ongoing duty to supplement after the initial production of documents responsive to the Court's order.

Further, the undersigned does not find credible Robert Ingoldsby's testimony regarding the number of written purchase orders SISS receives.  His self-serving testimony that 70% of dealer orders were placed over the phone is belied by the discussion at the October 2014 conference, as well as, the letters from Defendants' counsel representing that "orders" were "discarded" and that "SISS discards all source documents (e.g. purchase orders, invoices, etc.)".   Moreover, Mr. Fielak testified that he always provided written orders one way or another.   Mr. Ingoldsby's testimony, however, that Mr. Fielak was the only dealer who sent written purchase orders is simply too convenient and coincidental to be believable, not to mention that it is contradicted by the October 2014 conference and related correspondence.

Even assuming *arguendo* that Mr. Ingoldsby's 70% testimony is accurate, the fact remains that he specifically testified that there were at least some orders placed by text message, email, fax, or written purchase order.   Mr. Ingoldsby's testimony clearly indicates that there were in fact some orders placed in writing, and those orders were not preserved and produced to 4SEMO as ordered by the Court.   At the evidentiary hearing, defense counsel tried to downplay this fact by noting Defendants' position that written orders only accounted for 30% of sales.   The Court's Order clearly did not make

Defendants production obligations contingent on the percentage of written orders, however.   Defendants were ordered to produce **all** underlying written documents relating to sales of storm shelters that they could obtain, and were advised that they had a continuing duty to supplement those documents.   Even if written orders only account for a minority of Defendants' sales, such a fact does not excuse Defendants from obeying an order of the Court or from following the Federal Rules of Civil Procedure.

The undersigned notes, however, that it appears that at the time of the October 2014 conference, the parties were of the understanding that the Quickbooks invoices were not "destroyed", but were printed and sent to the purchasing dealers without extra copies being made.   Accordingly, the undersigned acknowledges that the Defendants reasonably concluded that they were not required to change their practice in this regard to begin saving hard copies of Quickbooks invoices since the invoices were contained in the computer file in the same form in which they were sent out.   Nonetheless, it is also clear, however, that Defendants were ordered to discontinue the process of destroying documents relating to written purchase orders for storm shelters.   The undersigned finds Defendants' arguments that they concluded that the only records being destroyed, and the ones referred to in the Court's October 2014 order, were bank records, to be disingenuous and a deliberate attempt to obscure what is an otherwise clear record on this point.   This clear record indicates that Defendants continued to destroy underlying documents relating to purchase orders even after being (1) ordered by the Court in October 2014 to produce these documents; (2) reminded by the Court of Defendants

ongoing duty to supplement these documents; and (3) being instructed by their *own counsel* to stop destroying these documents.   It is clear the defendants recklessly and in bad faith violated a discovery order of the Court, and as such sanctions are appropriate under Rule 37(b).

The question then is what is the appropriate sanction?   Plaintiff seeks entry of a default judgment in its favor.   A sanction must be proportionate to the circumstances surrounding the underlying discovery violation, however.   Though the Defendants acted in bad faith, the undersigned is of the view that a sanction of a default judgment would be disproportionate to the circumstances surrounding the violation.   In a situation where one party seeks a dismissal or default as a sanction, the question of the prejudice of the offending party's actions should be considered.   ***See Pendell v. City of Peoria*, 799 F.3d 916, 917 (7th Cir. 2015) ("Factors relevant to the decision to dismiss include the plaintiff's pattern of and personal responsibility for violating orders [and] the prejudice to others from that noncompliance....") (citing *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 562 (7th Cir. 2011); *Gabriel v. Hamlin*, 514 F.3d 734, 737 (7th Cir. 2008); *Ball v. City of Chicago*, 2F.3d 752, 760 (7th Cir. 1993))**.   Here, the prejudice issue weighs against the harsh sanction of a default judgment.   First, Defendants' offensive conduct affects only evidence relating to Plaintiff's damages.   Defendants' acknowledgement that they continue to use the mark renders this evidence irrelevant to liability.   In destroying the written source documents, Defendants destroyed evidence as to Plaintiff's damages, and this conduct largely does not affect Plaintiff's liability case.

It seems somewhat disproportionate to summarily grant Plaintiff a victory on its liability case due to sanctionable conduct only affecting Plaintiff's damages.   In addition, the prejudice to Plaintiff's damages case is low.   Plaintiff has plenty of evidence as to the amount of its damages from the Quickbooks files.   Though Plaintiff has suffered some prejudice in that it has not been provided the underlying hard copies that went into those digital files, it is not as if Plaintiff has no evidence it can present whatsoever. Though Plaintiff stated that the reason it wanted the source documents was due to its concern that the Quickbooks data had been altered, when given a mirror image of the Quickbooks data, Plaintiff, incredibly, did not have its expert perform an audit of the data to determine whether it had been altered.   At this point, the fact that Plaintiff does not know whether the Quickbooks data was altered, is largely Plaintiff's own fault.

It is also important to note that Plaintiff never brought any issues concerning the lack of production of source documents to the attention of the Court until it filed the motion at bar on the eve of trial.   The undersigned understands that Defendants continually assured Plaintiff that they would provide the discovery, and that the duty was on Defendants to follow the Court's Order and the federal rules and produce the discovery ordered.   Plaintiff, however, did not bring this issue to the Court's attention until very late in the ballgame, and should have done so much sooner than when it did. The Court ordered production and ongoing supplementation of the written source documents nearly two years before the 2016 trial date.   Regardless of whatever assurances it received from Defendants, Plaintiff should not have waited until the eve of

trial to raise the issue of Defendants' failure to comply with the October 2014 order.

For these reasons, the undersigned finds that, though Defendants' actions were reckless and in bad faith, to sanction them with a default judgment would be a stretch too far, and would provide Plaintiff an undeserved windfall. Therefore, among the other sanctions that may be imposed under Rule 37(b), the undersigned is of the belief that the most appropriate sanction is to not allow Defendants to put on evidence refuting Plaintiff's damages in the event of a finding of liability of any of Plaintiff's infringement claims. In making this recommendation, the undersigned is cognizant that he must consider whether lesser sanctions are sufficient, and is aware that Defendants take the position that they essentially have no issue with the sanction recommended today. Defendants assert that they will have to declare bankruptcy regardless of the damages amount. They even claim, if the Court finds they acted in bad faith, that they have no objection to the Court entering judgment in Plaintiff's favor for $40 million. Nonetheless, the sanction of a default is too disproportionate to the circumstances surrounding the offense, and there is no other suitable sanction. Regardless, no matter what Defendants may say, the undersigned has no doubt that the sanction he recommends today is not a desirable outcome for them. Preventing Defendants from opposing Plaintiff's damages evidence is the most appropriate sanction given the circumstances.

## CONCLUSION

For the reasons articulated above, the undersigned **RECOMMENDS** that the

district judge **GRANT in part and DENY in part** Plaintiff's Motion for Judgment without Trial as Sanction.   Specifically, the undersigned **RECOMMENDS** that that the district judge impose a lesser sanction of prohibiting Defendants from opposing Plaintiff's evidence relating to its damages for its infringement claims.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties may object to any or all of the proposed dispositive findings in this Recommendation. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *See, e.g., Snyder v. Nolen*, 380 F.3d 279, 284 (7th Cir. 2004). Accordingly, Objections to this Report and Recommendation must be filed on or before **February 24, 2017**.

**IT IS SO ORDERED**.
DATED: 2/10/2017

/s/ Stephen C. Williams
STEPHEN C. WILLIAMS
United States Magistrate Judge