IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| 4SEMO.COM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:13-cv-00297 DRH/SCW |
| | ) | |
| v. | ) | |
| | ) | |
| SOUTHERN ILLINOIS STORM | ) | |
| SHELTERS, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

FINDINGS OF FACT, CONCLUSIONS OF LAW AND  ORDER AND JUDGMENT

*[PROPOSED]*

The above-style action was tried before the Court during the week of July 31, 2017.  At the conclusion of the evidence, the Court granted the request of the parties to submit their closing arguments in writing.   Following the submission of such closing remarks, the case was taken under submission on September 8, 2017.

Now, having considered the evidence, the credibility of the witnesses and the written closing arguments of counsel, the Court hereby FINDS, RULES, and ADJUDGES as follows:

I.       RULINGS ON OBJECTIONS TAKEN WITH THE CASE

During the trial of this action, Plaintiff lodged objections to certain testimony, deposition submissions, and other evidence, which the Court indicated it would consider when reviewing the evidence.  Having now had the opportunity to do so, all such objections are expressly overruled.  The matters to which the objections pertained have been considered and have been given the weight the Court believes such evidence is due, if any.

II.      BACKGROUND

The instant action was commenced on or about March 22,2013, when the Now-Defendants filed a Complaint against 4SEMO.Com, Inc. ("4SEMO"), one of their dealers, in the name of Southern Illinois Storm Shelters, Inc. ("SISS").  That Complaint alleged 4SEMO had infringed a purported "Life Saver Storm Shelters" trademark the Defendants claimed they owned through SISS and also raised related claims.  4SEMO answered and counterclaimed, asserting that the "Life Saver Storm Shelters" mark in issue was actually its mark, and also asserting claims for a breach of its dealer contract and other claims discussed in more detail below.  The Complaint and Counterclaim were each thereafter amended by their respective claimants, 4SEMO's Counterclaims being amended twice.   On February 20, 2015 this Court struck the damage claims that had been asserted in the name of SISS.  On August 11, 2015, this Court dismissed counts 3 through 7 of the Defendants' SISS claims in their entirety.  On August 26,2015, this Court granted defensive summary judgment in favor of 4SEMO on Counts 1 and 2 of the SISS claims.  Those rulings fully adjudicated the claims that had been raised by the Now-Defendants in their initial and amended Complaints.  The case then continued forward solely on 4SEMO's counterclaims, with the parties re-aligned by the Court such that 4SEMO became denominated Plaintiff  and Robert Ingoldsby, SISS and Ingoldsby Excavating, Inc. became denominated as Defendants.[1]

At the outset of trial, 4SEMO notified the Court and opposing counsel that it would not be submitting Counts II, IV, VI, VII, XI or XII of its Second Amended Counterclaim.  The case thus proceeded solely on 4SEMO's claims alleging Trademark Infringement under the Lanham Act (Count I), False Endorsement and Unfair Competition under the Lanham Act (Count III),

---

[1] The parties were referred to as so realigned throughout the trial of this action, and are referred to as realigned in this Order and Judgment.  4SEMO is thus referred to herein as the Plaintiff, and Robert Ingoldsby, SISS and Ingoldsby Excavating, Inc. are referred to as the Defendants.

violations of the Illinois Uniform Deceptive Practices Act (Count V), Breach of Contract (Count VIII), Common law Unjust Enrichment (Count IX) and Civil conspiracy (Count X)

III.    CREDIBILITY OF THE WITNESSES

In large part, the resolution of the matters raised at trial turns on the credibility of the witnesses presented.  Having had the opportunity to hear live testimony and to observe the demeanor of the witnesses, to review the testimony of nonparty witnesses submitted by deposition, and having considered all other evidence of record, the Court finds the testimony of Ray Fielack on material matters to be highly credible and believable, and finds material portions of the testimony of Scott Ingoldsby and Robert Ingoldsby to lack such credibility.   The Court's determination as to credibility is based on the observation and perception of the witnesses who testified at trial, including Mr. Fielack and the Ingoldsbys.  However, the Court also notes that the deposition testimony of nonparties Taylor and Moss corroborated Mr. Fielack's testimony, although none of those witnesses had worked for 4SEMO for over ten years.  In fact, Mr. Moss, admits in his testimony that his departure from 4SEMO.com, Inc., was not on the best of terms. In addition, the Court found the Ingoldsbys' claimed inability to recall important details of, or claimed non-involvement with, certain matters suspect, especially in light of their ability to claim certitude with respect to other matters when helpful to their cause.  In addition, at one point Defendant Robert Ingoldsby testified, in response to a leading question from counsel, that a Dealer Agreement between the parties was terminated in 2012 when it appeared that testimony would help the Defendants.  He testified to the 2012 date, however, despite the fact that the termination attempt was made by written letter dated in 2013, and the parties had already stipulated pre-trial to the 2013 termination date.  The Defendants also contended they did not buy the dormant, nonoperational, Grone Company (discussed in more detail below) in an attempt to

retroactively acquire superior rights to a name similar to 4SEMO's trademarks that were here in issue.  However, the documents of record reflect that the acquisition was the sole, though erroneous, basis asserted for the Defendants opposition to 4SEMO's registration application before the United States Patent and Trademark Office ("USPTO") and was also the basis for the Defendants' initial and amended Complaints before this Court.  The record is also devoid of any business justification for spending money for a non-operational company in Missouri, when Defendants had already been selling shelters directly into Missouri under the SISS name and had set up separate purported companies for all other aspects of their operations from scratch, rather than purchasing existing entities, let alone nonoperational ones.   Similarly, throughout the trial, all evidence indicated that the Defendants first purchased brochures using 4SEMO's Life Saver Storm Shelters trademark and Greek Cross logo from 4SEMO in February of 2006.  Defendants themselves introduced a copy of one of the brochures they obtained at that time, which bore the copyright date of 2005, as Defendants' Exhibit 39.   Yet, despite this overwhelming evidence and despite their own Defendants' Exhibit 39, Scott Ingoldsby then testified he believed that Defendants Exhibit 40 (which did not have the Greek Cross Logo) was a copy of the first brochure purchased from 4SEMO by Defendants in February 2006, rather than Defendants' Exhibit 39,  and attempted to claim that brochures containing the Greek Cross logo were not purchased by the Defendants from 4SEMO until 2008 or 2009.   He did so without noticing that Exhibit 40 itself indicated on its face that it was actually a print out of an Oklahoma website, printed in 2013.   Finally, the Defendants also proffered the deposition testimony of a former dealer, Sydney Neubert, prompting 4SEMO to submit cross-designations from the Neubert deposition that constituted cross examination of Mr. Neubert.   Upon review of the Neubert

deposition testimony the Court also found the testimony of Mr. Neubert and the testimony of Scott Ingoldsby pertaining to the Neubert testimony to lack credibility.

IV.   FINDINGS OF FACT

The Court finds the following facts to have been established at trial[2]:

1.     4SEMO is a Missouri corporation, in good standing, which at all times relevant hereto, has operated, sold products and services, and advertised throughout the Southeast Missouri region and in parts of Illinois and Arkansas, and has operated a website which reaches a national audience.

2.     Defendant Robert Ingoldsby and his brother Scott, have been engaged in the business of manufacturing and selling storm shelters, together, since 1998.

3.     Storm shelters are below or above ground bunkers which are used to protect people or property from severe weather such as tornadoes, into which people go to get out of the storm.

4.     The Ingoldsby brothers utilized no purported entity structures to conduct their storm shelter operations until the year 2000, and admit that, at least up to that point, they considered the business to be that of Defendant Robert Ingoldsby individually.

5.     Defendant Southern Illinois Storm Shelters, Inc. ("SISS") was established by Robert Ingoldsby in the year 2000, and Defendant Ingoldsby Excavating, Inc. ("Ingoldsby Excavating") was established in 2008.

6.     Defendant Robert Ingoldsby controls and was the person who was responsible for, and made, the decisions made for and under the name of Sothern Illinois Storm Shelters, Inc.

---

[2] For clarity of presentation, this Order and Judgment presents matters deemed to be findings of fact separate from those deemed to be conclusions of law.  However, the distinction is not always easily made and to the extent any matter labeled a finding of fact is more properly considered a conclusion of law, it should be considered a conclusion of law.

7.      Defendant Robert Ingoldsby controls and was the person responsible for, and made the decisions that were made for and under the name of Ingoldsby Excavating.

8.      Robert Ingoldsby, SISS and Ingoldsby Excavating all operate out of the same location, using the same phone numbers, same quick books software and computers, and cell phones, and use the same personnel.  They were all represented in this action by the same lawyers.

9.      Ingoldsby Excavating was only established in 2008 for sales tax reasons

10.      Defendant Robert Ingoldsby entrusted most or all of the face-to-face dealings between the Defendants and 4SEMO that are the subject of the instant dispute to his brother Scott Ingoldsby and Scott Ingoldsby had full authority to act on behalf of all Defendants.

11.      Scott Ingoldsby operated at all times relevant to this action simultaneously under both the SISS and Ingoldsby Excavating company names, but never tracked what time he spent for which company.  He merely knew in his own head which company he was working for on any particular task

12.      At all times relevant hereto, each of the actions of Scott Ingoldsby were taken for, on behalf of, and as the actions of Defendants SISS, Robert Ingoldsby, and Ingoldsby Excavating if in fact, the Defendants were or are separate entities.

13.      Scott Ingoldsby never distinguished between companies or even talked in terms of company, when dealing with 4SEMO;

14.      Even after this case was in litigation, Defendants ran at least one advertisement claiming to be both the manufacturer of storm shelters, and the company which consumers should call to purchase shelters for installation in Southern Illinois, without distinguishing between separate companies.

15.     The record is devoid of any corporate formation documents, articles of incorporation, bylaws, operating agreements, board resolutions, or any other evidence of corporate activity in general, and importantly, is even devoid of any corporate resolutions, authorizations, or agreements concerning any of the Defendants' dealings with 4SEMO or relating to the use of the LifeSavers Storm Shelters trademark here in issue.

16.     The only intercompany document is a purported dealer agreement between Ingoldsby Excavating and SISS

17.     In 2005, 4SEMO was in the business of home renovation and remodeling, among other things.

18.     In the course of that business, in 2004, 4SEMO bought a storm shelter manufactured by Defendants from a dealership owned and operated by Michelle Masters and Barry Aycock, husband and wife. (hereafter referred to as the "Aycocks");

19.     4SEMO purchased that shelter at the request of one of its customers for whom 4SEMO was doing remodeling work, and resold it to that customer as part of its remodeling work for the customer.

20.     As a result of that experience, 4SEMO believed there was a market for the sale and installation of storm shelters, and spoke with the Aycocks about a plan pursuant to which 4SEMO would add the sale and installation of shelters to its products, product lines and services, and would purchase any storm shelters it sold through the Aycocks' dealership

21.     The Aycocks agreed to support that approach and provided 4SEMO with some literature on the storm shelters they carried, which referred to the storm shelters using the Southern Illinois Storm Shelters name.

22.     4SEMO added storm shelters to its business plan and began marketing storm shelter sales and installation services as an additional product/service line.

23.     In marketing storm shelters during this period, 4SEMO initially utilized the marketing materials received from the Aycocks.

24.     4SEMO then created its own brochures which used the initials S.I.S.S. to refer to the Defendants as manufacturers, Plaintiff's Trial Exhibit 10, to avoid the use of the "Southern Illinois" moniker; 4SEMO did so because it believed the use of the Illinois reference might be confusing with respect to attempted sales in Missouri and Arkansas and because of its own Missouri location.

25.     Shortly after 4SEMO began its storm shelter marketing efforts, the Aycocks approached 4SEMO and asked if 4SEMO would be interested in simply taking over the storm shelter dealership and becoming a direct dealer of the Defendants' storm shelters

26.     4SEMO checked the Defendants' website to determine what other dealers would be in 4SEMO's vicinity if they were to acquire the dealership and go forward.

27.     4SEMO agreed to take over the storm shelter dealership from the Aycocks and the Aycocks informed the Defendants of their and 4SEMO's desire to transfer the Aycocks' dealership to 4SEMO.

28.     The Defendants agreed to enlist 4SEMO as a dealer of its storm shelters in place of the Aycocks, so long as the Aycocks formally agreed to the change.

29.     In order to release their dealership rights to 4SEMO, the Aycocks merely requested that 4SEMO purchase the two storm shelters which the Aycocks had in inventory (the "Existing Inventory Shelters") and 4SEMO agreed to do so.

30.     The Aycocks and 4SEMO agreed on the terms on which the Aycocks would release their dealership rights to 4SEMO in mid to late April of 2005; When they reached that understanding the Aycocks agreed that 4SEMO could take possession of the two Existing Inventory Shelters immediately, to use as display shelters, while the parties worked out formal agreements.

31.     At that time, in light of 4SEMO's movement towards becoming a direct dealer of storm shelters, 4SEMO's president Ray Fielack decided it would be beneficial for 4SEMO to have its own trademark to identify it as the source of storm shelters it sold, to avoid any confusion from the Southern Illinois Storm Shelters name, and to generate and embody good will for 4SEMO.

32.     Mr. Fielack, informed the rest of the 4SEMO staff of the company's impending acquisition of the storm shelter dealership and his desire to develop a trademark for 4SEMO to use in connection with its retail sale and installation of storm shelters, and initiated a brainstorming session among the staff to come up with an appropriate mark.

33.      As a result of those discussions, Mr. Fielack ultimately selected a name that he himself had come up with, LifeSaver Storm Shelters, to be used by 4SEMO as its mark in conjunction with its retail sales and installations of storm shelters

34.     Mr. Fielack and a 4SEMO employee, Ross Taylor, then came up with an associated logo mark, comprised of a Greek Cross with the Life Saver Storm Shelters phrase imbedded in its horizontal arms.

35.     At the time Mr. Fielack came up with the Life Saver Storm Shelters name and caused 4SEMO to adopt the Life Saver Storm Shelters name and related logo as trademarks of 4SEMO,   Mr. Fielack had never heard of the name being used in conjunction with storm shelters

before, had never seen the name used in that context before, had never heard of any person or

company that used it in connection with storm shelters before, and had never seen it used on any

marketing materials or other document relating to storm shelters before.

36.     The Defendants' marketing materials that were received by Plaintiff from the

Aycocks in early 2005 did not include or reference a Life Saver name or mark

37.     When Mr. Fielack checked the Defendants' website when he was thinking of

causing 4SEMO to acquire the dealership from Michelle and Barry Aycock, there was no

reference to Life Saver Storm Shelters in any manner or for any purpose on the Defendants'

website.

38.      When Mr. Fielack suggested the Life Saver mark to 4SEMO staff, nobody

indicated they had heard or seen it before.

39.     No one suggested the Life Saver Storm Shelters name to Mr. Fielack.

40.     Mr. Fielack came up with the Life Saver Storm Shelters mark on his own, as a

result of his own marketing ideas and creativity.

41.     4SEMO checked the federal trademark office to see if anyone had registered a

similar trademark and no one had done so.

42.     4SEMO did a general internet search to see if anyone was using a similar name in

connection with storm shelters and found no indication that anyone was doing so.

43.     Neither Scott Ingoldsby nor any other representative of Defendant ever mentioned

the Life Saver name prior to learning of 4SEMO's adoption of the mark and seeing 4SEMO's

use of it.  When Defendants later first learned of 4SEMO's adoption of the Life Saver Storm

Shelters mark, they did not indicate to 4SEMO that the Life Saver Storm Shelters mark or any

similar mark had been used before by themselves, or anyone else, or that they had heard of the use of the mark or had ever seen it used before.

44.    The Defendants acknowledge they did not conceive the Life Saver Storm Shelters mark or the Greek Cross logo with the name imbedded in it.

45.    4SEMO took possession of the Existing Inventory Shelters from the Aycocks and constructed a raised viewing deck to use with them, in mid to late April 2005.

46.    The Existing Inventory Shelters, and the other shelters 4SEMO would thereafter sell, were and are designed so that the entrances are at ground level once the shelters are sunk into the ground.

47.    Before installation of the shelters, while a shelter is sitting on the ground rather than being sunk into it, the shelter's opening is substantially above ground level and a person cannot get into them or look into them.

48.    The viewing deck constructed by 4SEMO was constructed to allow potential purchasers to look into an uninstalled shelter so as to view the interior of the shelter; It was constructed such that the deck height was just above the top of the storm shelters being displayed while they were sitting on the ground; The shelters were nosed up against the deck, so that persons standing on the deck could look down into them and see the inside.

49.    The shelters were not enclosed within the deck, but merely nosed up against it, and the exterior of the shelters were still visible.

50.    4SEMO used a stencil to paint its Life Saver Storm Shelters trademark, its related Greek Cross logo, and its phone number onto the Initial Inventory Shelters when they obtained them from the Aycocks in April 2005.

51.     4SEMO used its viewing deck in connection with the Existing Inventory Shelters beginning in April of 2005, and nosed them against the deck such that the Life Saver Storm Shelters name and Logo (and 4SEMO's phone number) painted on the Existing Inventory Shelters remained visible to the public.

52.     4SEMO also placed signage on the viewing deck which utilized the Life Saver Storm Shelters mark and the Greek Cross logo mark to reference the shelters that could be purchased from 4SEMO.

53.     The signage was fastened to the road side of the deck, and had the name and the Greek Cross logo visible to passersby.

54.     4SEMO also began using the Life Saver Storm Shelters mark and related Greek Cross logo mark in brochures it created and printed in-house in April of 2005, after acquiring the Initial Inventory Shelters.

55.     Plaintiffs Exhibit 8 is a brochure created by 4SEMO as revised in late May of 2005.  In the brochure, 4SEMO utilized the Life Saver Storm Shelters name and Greek Cross logo, claimed trademark rights and also claimed to use Life Saver Storm Shelters as a d/b/a of the company.

56.     Plaintiffs Exhibit 8 was a revised version of the brochure using the marks originally created by 4SEMO in April of 2005; the original version had the same general content as Plaintiff's Exhibit 8.

57.     In the course of the April 2005 discussions with the Aycocks and Defendants regarding 4SEMO's takeover of the Aycocks' dealership, 4SEMO learned that the smaller of the two Existing Inventory Shelters it was purchasing from the Aycocks was actually a discontinued

model, and the Defendants agreed that, the Defendants would swap out the discontinued shelter for the newer version of the same size model.

58.     On May 5, 2005, the Defendants and 4SEMO formally signed and entered into the Dealer Agreement with Defendants pursuant to which 4SEMO became a direct dealer of storm shelters manufactured by Defendants; A true and accurate copy of the agreement between the parties is reflected in trial exhibits Plaintiffs Exhibit 3 and Defendants Exhibit 25. (the "Dealer Agreement.")

59.     On May 19, 2005, 4SEMO and the Aycocks formally signed and entered into their agreement pursuant to which the Aycocks released any rights under their prior Dealer Agreement with Defendants to 4SEMO; on that date 4SEMO also paid the Aycocks for the Initial Inventory Shelters which were already in 4SEMO's possession.  A true and accurate copy of the agreement between 4SEMO and the Aycocks is also a part of Plaintiff's Exhibit 3.

60.     Following the signing of the Dealer Agreement with Defendants, 4SEMO continued actively marketing the sale of storm shelters using its Life Saver Storm Shelters mark and Greek Cross logo mark; 4SEMO applied the marks to the storm shelters themselves by stenciling the name, logo and its phone number onto shelters it sold, used the name and logo in advertising, including yellow pages advertising, used them in its brochures and at its facility, and used them in use and care manuals and installation manuals for the shelters it provided to purchasers of the shelters it sold.

61.     In early May 2005, shortly after 4SEMO and the Defendants signed the Dealer Agreement, Scott Ingoldsby visited 4SEMO's facilities on behalf of Defendants to exchange a newer version shelter for the smaller of the Existing Inventory Shelters, as 4SEMO and the Defendants had previously agreed.

62.     When he did so, Ray Fielack, 4SEMO's president and principal, showed Scott Ingoldsby the Life Saver Storm Shelters and Greek Cross logo marks 4SEMO had adopted and the brochures that they had created using them; 4SEMO also explained to Scott Ingoldsby, how 4SEMO was marketing and selling the storm shelters it sold, including those purchased from SISS, under its trademarks and pursuant to a business, marketing and advertising plan.

63.     At that time Scott Ingoldsby saw 4SEMO's Life Saver Storm Shelters mark and the Greek Cross Logo stenciled onto the Initial Inventory Storm Shelters and saw 4SEMO's Life Saver Storm Shelters signage on 4SEMO's viewing deck.

64.     4SEMO then turned the smaller of the Existing Inventory Shelters (with its Life Saver Storm Shelters mark and logo stenciled on it) over to Scott Ingoldsby for transport to the Defendants, and accepted the newer, more valuable model of shelter which Scott Ingoldsby had brought with him to 4SEMO.

65.     The smaller Existing Inventory Shelter was then transported from 4SEMO's Missouri location to the Defendants in Illinois.

66.     4SEMO stenciled its Life Saver Storm Shelters mark and the Greek Cross logo on the new shelter it obtained from Defendants (the "Exchange Shelter"), and placed the Exchange Shelter in 4SEMO's viewing deck alongside the remaining Initial Inventory Shelter, so that potential customers could view the shelters, and continued marketing the sale of storm shelters under its Life Saver Storm Shelters name and Greek Cross logo.

67.     In November of 2005, two individuals named Mr. and Mrs. Corum visited the 4SEMO facility, viewed the remaining Initial Inventory Shelter and the Exchange Shelter, the Life Saver Storm Shelters signage and 4SEMO's brochures which utilized the Life Saver Storm Shelters mark and the Greek Cross Logo mark and purchased the remaining Initial Inventory

14

Shelter from 4SEMO.  The Corums paid for the shelter at that time, but set up delivery of the shelter for a future date.

68.      In December 2005, 4SEMO transported the stenciled Existing Inventory Shelter the couple had purchased to them, and caused the same to be installed with the assistance of Scott Ingoldsby for the Defendants.

69.      4SEMO continued to consistently market and sell storm shelters under and using its Life Saver Storm Shelters trademark and Greek Cross logo, and has consistently used its marks in connection with its sales and installations ever since.

70.      4SEMO has made regular and consistent sales of storm shelters since May of 2005, and has installed the same, and each of those regular and consistent sales and installations were made under and in conjunction with 4SEMO's use of the Life Saver Storm Shelters mark.

71.      4SEMO has been using the Life Saver Storm Shelters name and Greek Cross logo as its trademarks consistently and systematically since mid-April of 2005, used them in conjunction with the exchange of the Initial Inventory Shelter with Defendants in May of 2005, with the November 2005 arms-length storm shelter sale noted above, and with every storm shelter sale and installation since.

72.      4SEMO has continuously used its Life Saver Storm Shelters trademark to reflect it as the retail source of the storm shelters it has sold and installed, even through two changes of storm shelter manufacturers/suppliers

73.      4SEMO has continued to utilize the LifeSaver Storm Shelters mark in all advertising materials, all brochures, care manuals, and by painting it via stencil or stickering it on all storm shelters it sells, regardless of manufacturer.

74.     In February 2006, Defendants, acting through Scott Ingoldsby, requested permission for Defendants to use 4SEMO's Life Saver Storm Shelters trademark and Greek Cross logo mark in conjunction with retail sales and installations of storm shelters by Defendants in Southern Illinois.

75.     The request was made for and on behalf of all Defendants by Scott Ingoldsby, and was not made on behalf of any particular Defendant, and no company names were used.

76.     Defendants only requested the right to use 4SEMO's Life Saver Storm Shelters mark and related logo for this limited use.

77.     After some consideration, 4SEMO agreed that Defendants could use 4SEMO's Life Saver Storm Shelters trademark and Greek Cross logo mark in conjunction with retail sales and installations of storm shelters by Defendants in Southern Illinois, provided that they were storm shelters Defendants manufactured,  that they were installed in the manner with which 4SEMO was familiar, and that 4SEMO approved and controlled the printing of all marketing materials containing its mark which Defendants would use in such fashion.  These were the only rights to use 4SEMO's Life Saver Storm Shelters mark and Greek Cross logo mark that were granted to Defendants.

78.     The Court specifically finds that the testimony of Ray Fielack and the former 4SEMO employees that such a limited use agreement was all that was requested and all that was granted is credible, and that the attempts of the Defendants to characterize the agreement as something other than this limited use agreement are not credible.  The Court also specifically finds the Defendants' contention that the agreement was solely for the rights to use the Greek Cross logo and not for the Life Saver Storm Shelters name itself is not credible and not believable.

79.     Notwithstanding the limited purposes for which 4SEMO granted Defendants the right to use the Life Saver Storm Shelters name and Greek Cross logo,   from the outset of Defendants' acquisition of brochures containing those marks from 4SEMO in February 2006 and continuing up through the trial of this cause,  the Defendants used the Plaintiff's trademarks in ways beyond the limited use that was authorized, including the use of the same in connection with the marketing and sale of their shelters to dealers nationwide for resale, and in connection with direct sales and installations outside of Southern Illinois.

80.     The Defendants also advertised and/or marketed its products using the Life Saver Storm Shelters mark in numerous forums and publications, including newspapers and trade shows across various states.

81.     Defendants registered and used the domain name for [www.lifesaverstormshelters.com](http://www.lifesaverstormshelters.com).

82.     In addition to its own direct misuse of the Marks and advertising brochures and its own sale of products and services under the Marks, the Defendants also intentionally induced dealers and distributors of storm shelters across the country to utilize 4SEMO's Life Saver Storm Shelters of Greek Cross logo marks and to sell goods and services thereunder.

83.     Defendants also supplied, and has continued to supply, products to dealers and distributors with the specific intent that they sell the same and related services under the Life Saver Storm Shelters mark

84.     All of Defendants' sales and installations of storm shelters have been made under and in conjunction with 4SEMO's Life Saver Storm Shelters mark since February 6, 20106.

85.     4SEMO was unaware of the Defendants' use of the Life Saver Storm Shelters mark and Greek Cross logo in ways and for purposes other than the Defendants' retail sale and

installation of storm shelters in Southern Illinois until 2011 and did not consent to or authorize any such use

86.     The actions taken by Defendants of which 4SEMO were aware prior to 2011 did not appear inconsistent with the limited use agreement, and did not put 4SEMO on notice of the Defendants unauthorized uses.

87.     Defendants' use of the marks in excess of their authorized manner was knowing and intentional; before 4SEMO even discovered the Defendants' unauthorized use of its marks, Robert Ingoldsby, on behalf of himself and the company Defendants, discussed with Scott Ingoldsby that Defendants would offer to purchase the Life Saver Storm Shelters name and logo from 4SEMO if and when 4SEMO discovered the improper use and complained.

88.     In or around late 2011, 4SEMO wanted to update its marketing materials and brochures; when 4SEMO's graphic designer went to work on the project, she did a quick internet search for "LifeSavers Storm Shelters" to locate 4SEMO's website and was surprised to see search engine returns for several websites all around the country, which indicated several SISS independent dealers and distributors were using the 4SEMO Life Saver Storm Shelters mark.

89.     The graphics designer contacted 4SEMO's president, Ray Fielack, and alerted him of what she had found; Ray Fielack ran a confirming internet search, and then immediately contacted Defendants' representative, Scott Ingoldsby.

90.     The notification from its graphic designer in 2011 was the first notice that 4SEMO received of the Defendants' unauthorized use of the Life Saver Storm Shelters and Greek Cross logo marks.

91.     In response to the call from Ray Fielack demanding the cessation of the improper use, Scott Ingoldsby, on behalf of Defendants, did not dispute the contention of unauthorized

use, but rather admitted the widespread unauthorized use, saying that he was supposed to have talked to 4SEMO previously, and made the proposal to buy the rights to the name and the logo and related materials that he had already discussed with Robert Ingoldsby;

92.     The agreement pursuant to which the Defendants would purchase the rights to the marks and related materials was refined over the next few days;

93.     In the course of those discussions, Scott Ingoldsby indicated the Defendants wanted to purchase a registered mark and requested that 4SEMO register the Life Saver Storm Shelters trademark and Logo prior to the sale, and 4SEMO accordingly took steps to do so.

94.     The agreement the parties reached in 2011 was that 4SEMO would not pursue any claims against Defendants for their unauthorized use of 4SEMO's Life Saver Storm Shelters and Greek Cross logo marks,  Defendants would buy the rights to the Life Saver Storm Shelters and Greek Cross logo marks and the associated website artwork, brochure templates, and other marketing materials from 4SEMO effective as of that date, that the parties would determine how the purchase price for those rights would be determined and paid,  and that Mr. Fielack or 4SEMO would work with the Defendants on a national rollout marketing campaign for the Defendants' utilizing the marks, including the offering of stencils and new brochures to all of Defendants' dealers.

95.     The parties then acted under the agreement, with periodic discussions on methods of pricing the rights acquisition price, and Ray Fielack working with Scott Ingoldsby to produce a nationwide stencil campaign, for use in connection with the true national roll out as agreed.

96.     Any and all consent of 4SEMO to the continued use of the Life Saver trademarks by the Defendants after the Defendants' 2011 agreement to purchase the rights from 4SEMO was

based on the understanding that Defendants had agreed to pay for the rights and was contingent on the parties' agreement being completed.

97.     In the months that followed, Defendants continued to represent to 4SEMO that the agreement was in place, continued to negotiate the price to be paid, and Scott Ingoldsby worked with Ray Fielack on the stencil and brochure design work for the national marketing campaign that 4SEMO was to do under the parties' agreement.

98.     At some point prior to July 19, 2012, however, the Defendants (through their lawyer) learned that an uninvolved and non-operational Missouri company had used a phrase similar to 4SEMO's Life Saver Storm Shelters trademark, (the name "Life-Saver Storm Shelters," with a hyphen), as its company name back in 2002; The Defendants also learned that, although out of business, that entity had not been formally dissolved.

99.     That company, Life-Saver Storm Shelters, LLC (with a hyphen), had originally been formed by an individual named John Grone in 2002. The company and Mr. Grone are hereafter referred to, together, the "Grone Company."

100.    Erroneously thinking that acquiring the inactive Grone Company would somehow excuse their unauthorized use of 4SEMO's Life Saver Storm Shelters mark and obviate the need to pay 4SEMO to acquire the rights the Defendants had agreed to buy, the Defendants decided they would not honor the agreement to purchase the marks from 4SEMO, and would instead purchase the dormant, nonoperational Grone Company and hold the same as a wholly owned subsidiary of the Defendants' purported SISS entity

101.    On July 19, 2012, Defendants told 4SEMO, via a text from Scott Ingoldsby to Ray Fielack, that Defendants were thinking of backing out of, and not completing, their

20

agreement with 4SEMO to buy the Life Saver Storm Shelters mark and associated materials, but did not disclose their intent to purchase the Grone Company.

102.    In an ensuing phone call, 4SEMO reminded Scott Ingoldsby that if Defendants did not close their purchase agreement, the Defendants' use of the Life Saver Storm Shelters mark would be unauthorized; After a heated exchange in which Scott Ingoldsby stated that the Defendants would then stop selling shelters to 4SEMO so it would have nothing to sell under its marks, the parties calmed and Scott Ingoldsby indicated he would have further discussions with Robert Ingoldsby and get back to 4SEMO with the Defendants' decision.

103.    Scott Ingoldsby did not get back to 4SEMO, but during the first or second week of August, 2012 Robert Ingoldsby confirmed the Defendants withdrawal from their Marks purchase agreement in a conversation with Ray Fielack at Defendants' facility.

104.    Following the Defendants' withdrawal from their agreement to buy the marks from 4SEMO, the Defendants filed an objection to 4SEMO's trademark application and filed a competing registration application. Those filings were the first time that 4SEMO became aware of  any claim that there had been a name similar to 4SEMO's Life Saver Storm Shelters mark used in connection with storm shelters prior to 4SEMO's adoption of the mark.

105.    Even in those 2012 USPTO filings, however, the Defendants never claimed that 4SEMO knew of any such prior "use" when 4SEMO independently created and adopted its Life Saver Storm Shelters mark and corresponding Greek Cross logo, or that the Defendants had ever mentioned such a prior company to 4SEMO.

106.    The Defendants also removed 4SEMO from their website listing of authorized dealers, refused to fill existing orders for 4SEMO, refused to take additional listings from 4SEMO, and began routing potential and actual purchasers from 4SEMO's contractual

dealership territory to other dealers, or selling and installing shelters in 4SEMO's territory themselves, either directly or through the "reanimated" Grone Company subsidiary they had bought from John Grone's widow.

107.    Defendants also continued to use 4SEMO's Life Saver Storm Shelters mark in conjunction with all sales and installations of storm shelters, at both wholesale and retail, and in fact expanded their use of, and investment in, the mark.

108.    Despite cutting off all business ties and refusing to sell or deliver product to 4SEMO, Defendants did not attempt to terminate the Dealer Agreement until a year later, in July of 2013, when Defendants' counsel sent a letter of termination to counsel for 4SEMO.

109.    The Defendants never offered or attempted to repurchase the three shelters 4SEMO had in its possession and used as display shelters at an "agreeable price" when they claimed to terminate the Dealer Agreement with 4SEMO.

110.    Defendants never took any steps to attempt to determine what a fair price to repurchase the shelters from 4SEMO would be.

111.    Notwithstanding the Dealer Agreement which provided 4SEMO with exclusive rights to install shelters manufactured by Defendants in identified territories, between the date the agreement was signed and the date Defendants' purported to terminate it, twenty-five storm shelters were sold and installed in the exclusive territories granted to 4SEMO in that Dealer Agreement by either Defendants, a wholly owned subsidiary of Defendants, or by another dealer of Defendants,  due to the acts and facilitation of Defendants

112.    Scott Ingoldsby acknowledged at trial that, as a practical matter, no dealer of Defendants' storm shelters would or will install a shelter that they didn't or don't also sell to the purchasing customer.

113.    If Defendants had informed storm shelter dealers and customers that any storm shelters purchased in the territories granted to 4SEMO during the 4SEMO dealership contract period had to be installed by 4SEMO, 4SEMO would have received the associated shelter sale business and revenue, as well as any revenue related to the installation of the shelters.

114.    The amount of profit 4SEMO would have made from the sales and installations of the 25 storm shelters that were installed within the exclusive territories granted by Defendants to 4SEMO by others during the contract period was calculated by Plaintiff's expert, Mark Hoffman, a Certified Public Accountant licensed in Missouri from the records of the Defendants themselves.

115.    The Court finds Mr. Hoffman to be credible and his analytical approach to be sound.

116.    The amount of profit 4SEMO would have made from the sales and installations of the 25 storm shelters that were installed within the exclusive territories granted by Defendants to 4SEMO by others during the contract period was $26,940.00

117.    Defendants used 4SEMO's Life Saver Storm Shelters Mark on or in connection with its sales and installations of each storm shelter sold and installed since February of 2006, both at wholesale and retail and without regard to customer or purpose.

118.    The Defendants use of 4SEMO's Life Saver Storm Shelters mark and Greek Cross logo mark has engendered actual confusion in the market place.

    a.    After 4SEMO began selling storm shelters manufactured by Atlas, a different manufacturer of storm shelters, a confused potential 4SEMO customer came to the Defendants facilities in an attempt to purchase an Atlas manufactured shelter, due to the Defendants' continued use of 4SEMO's Life Save Storm Shelter mark.

23

b.      Similarly, 4SEMO has and does receive periodic inquiries, both by phone and in person visits, from potential customers about the Defendants' manufactured shelters on an ongoing basis, rather than for those models from other manufacturers that are actually sold by 4SEMO, due to Defendants continued use of 4SEMO's Life Saver Storm Shelters mark

119.    The Defendants are likely to continue using the Life Saver Storm Shelters Mark post trial and on an ongoing basis, and to continue to urge and purport to authorize to do so, unless prevented from doing so.

120.    The widespread use of the 4SEMO marks by Defendants and the Defendants' active encouragement of its dealers nationwide to also use 4SEMO's Life Saver mark, has damaged and is damaging 4SEMO, and will continue to so.

121.    The Defendants did not take any actions or act any differently than they would have acted if 4SEMO would have asserted its claims against them sooner than they were actually asserted.  They have conducted business as usual.

122.    The revenues the Defendants gained from sales made in conjunction with an unauthorized use of 4SEMO's Life Saver Storm Shelters mark were also calculated by Plaintiff's expert, Mark Hoffman, from the records of the Defendants themselves.  Mr. Hoffman possesses several other accounting certifications, besides his CPA, and has extensive experience in determining trademark damages.

123.    The Court finds Mr. Hoffman to be credible and his analytical approach to be sound.

124.    Not including sales and installations made by Defendants in Southern Illinois, from February 2006 until December 31, 2011, the Defendants earned $6,104,992.00 from sales

and installations made in conjunction with their use of the Life Saves Storm Shelters marks (i.e. the Defendants earned $6,104,992.00 from their use of the Life Saves Storm Shelters mark and/or Greek Cross logo mark in manners other than those that had been agreed to by 4SEMO), which they characterized as revenue earned by SISS.

125.    From January 2012 until July 1, 2017 (the month of trial), Defendants earned an additional $11,266,011.000 from their sales and installations made in conjunction with their use of 4SEMO's Life Saver Trademark, of which they characterized $10,388,770.00 as additional revenue of SISS and $877,241.00 of which they characterized as revenue of Ingoldsby Excavating.

126.    As of the first day of July, 2017, the Defendants had thus earned a total of $17,371,003.00 in revenue from (a) their use of 4SEMO's Life Saver Storm Shelters Mark between February 6, 2006 and December 31, 2011 and (b) their continued use of the 4SEMO Life Saver Storm Shelters mark after January 1, 2012

127.    Of the $17,371,003.00 in revenue so earned by the Defendants, $11,266,011was earned between January 1, 2012 and July 1, 2017.

128.    The Defendants did not submit any evidence of costs or other offsets to reduce or offset against the revenue numbers at trial.

129.    Defendant Robert Ingoldsby was and is the President of both SISS and Ingoldsby Excavating and, to the extent the same were validly operating as separate entities, made the decision for himself and each of those companies that they would use Plaintiff 4SEMO's LifeSaver Storm Shelters mark in all manners in which it was used, and to keep using it in such manners up through trial.

130.    If and to the extent they were separate entities and/or operations, SISS sold product to Ingoldsby Excavating knowing that it would be sold and installed under 4SEMO's Life Saver Mark, and encouraging and inducing the sales under the mark by Ingoldsby Excavating

V.    CONCLUSIONS OF LAW

The Court has made the following conclusions of law:[3]

1.    This Court has original subject matter jurisdiction over this action pursuant to the Lanham Act, 15 U.S.C. § 1051, et seq., 28 U.S.C. §1331 and 28 U.S.C. §1338(a)(b), and has supplemental jurisdiction over 4SEMO's state law and common law claims under 28 U.S.C. §1367.

2.    Venue is proper in the Southern District of Illinois pursuant to 28 U.S.C. §1391, 28 U.S.C. §1367 and 15 U.S.C. §1121.

3.    Upon the filing of the Defendants' initial Complaint in this cause, the United States Patent and Trademark Office stayed its review of 4SEMO's pending trademark registration application, to await the results of this case; this matter thus involves unregistered marks.

4.    The Lanham Act protects unregistered marks to the same extent as registered. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L.Ed.2d 615 (1992)

5.    The Lanham Act protects words, names, symbols, or devices that a person or company uses in connection with goods or services, in commerce, "to identify and distinguish

---

[3]   As noted above, for clarity of presentation, this Order and Judgment presents matters deemed to be findings of fact separate from those deemed to be conclusions of law.  However, the distinction is not always easily made and to the extent any matter set forth below as a conclusion of law is more properly considered a finding of fact, it should be considered a finding of fact

[its] goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1125(a)(1), 1127.

6.      4SEMO established its ownership of the phrase Life Saver Storm Shelters (the "Name Mark") and the Greek Cross logo with the Name Mark imbedded in its horizontal arm (the "Logo Mark") by appropriation and use of that phrase and logo to identify and distinguish 4SEMO's goods and services from those of its competitors.  The Name Mark and Logo Mark. (Hereafter the Name Mark and Logo Mark may be referred to, together, at times as "the Marks")

7.      The painting of the Name Mark and Logo Mark on the Existing Inventory Shelters and the use of the Marks on 4SEMO's viewing deck signage, and the dates of brochures and other advertising materials beginning in April 2005, may qualify as use of the Marks in Commerce, but in any event 4SEMO first used the Name Mark and Logo Mark in commerce at least as early as May 2005 when the smaller Existing Inventory Shelter, with the Name Mark and Logo Mark painted upon it (along with 4SEMO's phone number) was exchanged for a shelter of higher value and transported from 4SEMO's Missouri location to the Defendants' Illinois location in early May of 2005.  The exchange and transfer was a bonafide transaction and was not made simply to reserve a right to the Marks.   15 USC 1127.

8.      Further, 4SEMO's bona fide sale of the larger, remaining, Existing Inventory Shelter in November of 2005 to the Corums' was also the result of, and an example of, the use of the Marks in commerce.

9.      4SEMO has consistently and regularly used the Marks in commerce in conjunction with its sales and installations of storm shelters ever since.

10.      The Marks are each a valid trademark that is, and has been at all times relevant to this action, entitled to protection under 15 U.S.C. § 1125 as an unregistered trademark.

11.     The agreement reached between 4SEMO and the Defendants in February of 2006 for the Defendants' limited use of the Marks constituted a trademark licensing agreement.

12.     Defendants' rights to the Life Saver Storm Shelters trademark and associated Greek Cross logo trademark came solely from, and were limited to, their agreement with 4SEMO.

13.     The Defendants' use outside the scope of the permitted use allowed under their agreement with 4SEMO was infringement, as was their continued use after any permission to use the Marks was withdrawn.  See Segal, 517 F.3d at 506 Franchised Stores of New York, Inc. v. Winter, 394 F.2d 664, 668 (2d Cir. 1968); see also Masters v. UHS of Delaware, 631 F.3d 464, 473 (8th Cir. 2011); Brennans Inc. v. Dickie Brennan & Co. Inc., 376 F.3d 356, 365 (5th Cir. 2008); Watec Co., LTD. v. Liu, 403 F.3d 645, 649 (9th Cir. 2005); McCarthy on Trademarks and Unfair Competition § 25:30 (4th ed.).

14.     The evidence establishes that Defendants' use of the Marks in commerce has caused actual confusion and is likely to cause confusion, mistake or deception as to the source of the products bearing or sold in conjunction with the Marks.

15.     In any event, where, as here, the alleged infringer is using the identical language as the claimed trademark owner, confusion is presumed and need not be separately established. *L&L Wings, Inc. v. Marco-Destin, Inc*., 676 F. Supp. 2d 179, 189 n.2 (S.D.N.Y. 2009); *Coach, Inc. v. Allen*, No. 11 Civ. 3590 (CM), 2012 U.S. Dist. LEXIS 100829, 2012 WL 2952890, at *7 (S.D.N.Y. July 19, 2012); *C=Holdings B.V. v. Asiarim Corp*., 992 F. Supp. 2d 223 (S.D.N.Y. 2013); *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981) Bunn-O-Matic Corp. v. Bunn Coffee Serv., 88 F. Supp. 2d 914, 922 (C.D. Ill. 2000) (citing Burger King v. Mason, 710 F.2d 1480, 1492-93 (11th Cir. 1983); Masters v. UHS of Delaware, Inc., 631 F.3d

464, 97 U.S.P.Q.2d 1386 (8th Cir. 2011), cert. denied, 131 S. Ct. 2920, 179 L. Ed. 2d 1248 (2011),

16.     In addition, Defendants allegation in paragraph 10 of their Amended Complaint that the use of the identical Life Saver Storm Shelters mark by Plaintiff 4SEMO and Defendants is likely to mislead, deceive, and confuse consumers is a judicial admission of such confusion, binding on Defendants.   SOO Line Railroad Company v St. Louis Southwester Railway Company, 125 F.3d. 481 (7th Cir. 1997)

17.     The Defendants use of the Marks in commerce on or in connection with its goods or services was also the use of the Marks in a manner that has deceived or is likely to deceive as to the affiliation, connection, or association of the Defendants with 4SEMO and as to 4SEMO's sponsorship, or approval of the Defendants and their other dealers' goods, services, and commercial activities in violation of 15 U.S.C. § 1125(a)(1)

18.     The unauthorized use by the Defendants of 4SEMO's Name Mark and Logo Mark has caused and/or is likely to cause confusion, mistake or deception as to the origin, sponsorship or association with the Marks.  Consumers are likely to believe that the Defendants' products or services are licensed by, sponsored by, originated with or associated with 4SEMO and the unauthorized use of the Marks falsely represents the Defendants as being connected with the ownership of the Marks.

19.     The Defendants have also intentionally, willfully, knowingly and wrongfully advertised, distributed and promoted the Marks without the consent, express or implied, permission, or authorization of the 4SEMO and as such, have misrepresented the nature and relationship between 4SEMO and the Defendants and the Defendants products and/or services.

20.     Further, the Defendants have failed to properly credit 4SEMO as the true creator of and origin of the Marks, and have intentionally refused to identify 4SEMO as the true creator of the Marks.

21.     By so doing, the Defendants are causing mistake, confusion and deception as to the true origin of products and the originality of products, and have falsely and deceptively advertised and promoted products.

22.     The Defendants' unauthorized use of 4SEMO's Life Saver Storm Shelters and Greek Cross logo marks violated, and is violating, 11 USC 1125.

23.     Pursuant to 15 USC 117, 4SEMO is entitled, subject to the provisions of sections 111 and 1114 of that title and principles of equity, to an award of (1) Defendants' profits, (2) any damages sustained by 4SEMO and (3) the costs of the action.  In assessing profits, 4SEMO was required to prove Defendants' sales only; Defendants were required to prove all elements of cost or deduction claimed.  If this Court finds that the amount of the recovery based on profits is either inadequate or excessive the Court may in its discretion enter judgment for such sum as the Court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The Court in exceptional cases may award reasonable attorney fees to the prevailing party

24.     Defendants' use of the Marks has irreparably damaged 4SEMO and will continue to damage 4SEMO irreparably unless enjoined by this Court, as a result of which 4SEMO is without an adequate remedy at law.

25.     4SEMO met its burden of proof and established that Defendants earned $17,371,003.00 in revenue from sales and installations of storm shelters made in conjunction with the unauthorized use of the Marks, of which $16,493,762.00 was characterized by

Defendants as revenues earned by SISS and $877,241.00 of which was characterized by Defendants as revenue of Ingoldsby Excavating.

26.     Defendants came forward with no evidence of costs or other offsets or reductions that Defendants incurred in conjunction with such sales, under the names of SISS, Ingoldsby Excavating or otherwise, and affirmatively represented prior to trial that they were waiving their right to do so.

27.     Accordingly, as a matter of law, the $17,371,003.00 of revenues earned by the Defendants from violations of section 15 USC 1125 are considered the profits they obtained.  15 USC 1117.

28.     The Defendants' use of the Marks in manners beyond the authorized limited use granted by 4SEMO and the continued use of the Marks after even that limited use grant terminated, was willful, egregious and intentional.

29.     Further, the Court notes that the vast amount of the revenue received by Defendants from sales in conjunction with their unauthorized use of the Marks, $11,266,011 of the $17,371,003.00 of such total revenue, was received AFTER the Defendants were confronted by 4SEMO and AFTER the Defendants agreed to buy the Marks from 4SEMO, only to withdraw from and refuse to follow through on that Agreement.

30.     An award to 4SEMO of the profits earned by Defendants in violation  of 15 USC 1125 would be inadequate under the  facts and circumstances of this case.

31.     Taking all matters into consideration, the Court concludes that an award of two times Defendants' profits is the sum which is a just award to 4SEMO for Defendants' violations of the Lanham Act under the circumstances of this case.

32.     Defendants' have acted in bad faith, intentionally, willfully and maliciously, have refused to cease the infringing activity, and have caused 4SEMO unnecessary trouble and expense.

33.     This case is exceptional and 4SEMO is properly awarded its Attorney's fees incurred in both defending against the Defendants original affirmative claims, and in pursuit of 4SEMO's own claims against Defendant.   121 USC 1117.

34.     The actions of each of the Defendants, and of Scott Ingoldsby, were taken as agent of each of the Defendants, and constituted acts of each Defendant.

35.     If and to the extent they were operating as validly separate entities, SISS, Robert Ingoldsby, and Ingoldsby Excavating combined for the purpose of accomplishing the unlawful purpose of using the trademarks of 4SEMO without authorization, and one or more of the conspirators committed an overt tortious or unlawful act in furtherance of that concerted action. The Defendants thus engaged in a Civil Conspiracy as defined by law, rendering them each liable for the actions of the others taken in furtherance of such combination and for such purpose." Fritz v. Johnston, 209 Ill. 2d 302, 317807 N.E.2d 461, 282 Ill. Dec. 837 (2004), citing Adcock v. Brakegate, Ltd., 164 Ill. 2d 54, 62-63, 645 N.E.2d 888, 206 Ill. Dec. 636 (1994),

36.     To the extent they are separate entities, SISS is contributorily and vicariously liable for the improper use of the Life Saver Storm Shelters mark by Ingoldsby Excavating.

37.     Robert Ingoldsby is and was the corporate officer who was and is the moving, active conscious force behind SISS and Ingoldsby Excavating's uses of 4SEMO's Life Saver Storm Shelters marks and is thus individually jointly and severally liable with SISS and Ingoldsby Excavating for those companies' liability under the Lanham Act (Counts I and III of

4SEMO's Second Amended Counterclaim.)   Dynamic Force, LLC v. Dynamic Force, Ltd., 98

C 5922, 1999 U.S. Dist. LEXIS 7892, 1999 WL 342407, at *4 (N.D. Ill. May 14, 1999)

38.   All Defendants are jointly and severally liable for the unauthorized uses of the

Marks taken in the name of, or which lead to revenues booked by Defendants as having been

received by, SISS;

39.   All Defendants are jointly and severally liable for the unauthorized uses of the

Marks taken in the name of, or which lead to revenues booked by Defendants as having been

received by, Ingoldsby Excavating

40.   The factual allegations forming the basis for 4SEMO's Lanham Act claims and

UDTPA claims are the same and, accordingly, the legal inquiry is the same under both statutes.

Claims for unfair competition and deceptive business practices brought under Illinois statutes are

to be resolved according to the principles set forth under the Lanham Act. *SB Designs v. Reebok

Int'l, Ltd.*, 338 F. Supp. 2d 904, 914 (N.D. Ill. 2004) (citing *Gimix, Inc. v. JS & A Grp., Inc.*, 699

F.2d 901, 908 (7th Cir. 1983).

41.   The Defendants have passed, and are passing, off goods or services as those of

another, in a manner which causes likelihood of confusion or of misunderstanding as to the

source, sponsorship, approval, or certification of goods and causes likelihood of confusion or of

misunderstanding as to affiliation, connection, or association with or certification by another, in

violation of the UDTPA 815 Ill. Comp. Stat. §510/2, et seq.

42.   The unauthorized use of 4SEMO's Marks by Defendants on products, on

advertisements, on the internet and in connection with services identical and/or similar to those

provided by 4SEMO causes a likelihood of confusion and deceives the public into believing that

4SEMO has authorized the use of such Marks by the Defendants.

43.     The unauthorized use of 4SEMO's Marks, as stated herein, on products, on advertisements, on the internet and in connection with services identical and/or similar to those provided by 4SEMO causes a likelihood of confusion and deceives the public into believing that 4SEMO has authorized the use of such Marks by the Defendants.

44.     4SEMO has been and is being damaged by such violations and has no adequate remedy at law, and the Defendants' unlawful and willful conduct will continue to damage 4SEMO unless enjoined by this Court.

45.     The Defendants receipt of revenues from the unauthorized use of the Marks constitutes a voluntarily acceptance of a benefit that would be inequitable for the defendant to retain without compensating the plaintiff. De David v. Alaron Trading Corp., 796 F.Supp.2d 915, 923 (N.D. Ill. 2010).

46.     The Defendants' actions in benefitting from their wrongful use of the Marks were taken in the course of and arose out of their business, and were committed in and out of their principal places of business in Illinois,

47.     It would be unfair and unjust under the totality of the circumstances for the Defendants to retain and enjoy the benefits of their unauthorized use of 4SEMO's Marks

48.     4SEMO has no remedy at law to secure redress for the unauthorized and uncompensated use of its ideas, plan and materials, and it would be unjust for Defendants to retain the enrichment gained from their improper use of such materials without compensating 4SEMO.

49.     The Dealer Agreement between Defendants and 4SEMO was a valid and enforceable contract, was substantially performed by 4SEMO, was breached by the Defendants installation and facilitation of the installation by others of storm shelters within the territories for

which Defendants had granted 4SEMO exclusive installation rights, and Defendants' breach caused 4SEMO damages.  Reger Dev., LLC v. Nat'l City Bank, 592 F.3d 759, 764 (7th Cir. 2010)

50.     If Defendants had honored their obligation to provide 4SEMO with its exclusive right to install shelters manufactured by Defendants in the territories granted to 4SEMO under the Dealer Agreement, 4SEMO would have also gained the related sales of the shelters to be installed;

51.     The loss of those sales is a direct and proximate result of Defendants' breach of their obligations under the Dealer Agreement, and the Defendants'' breach proximately caused 4SEMO to lose profits totaling $26,940.00.

52.     The Defendants asserted no affirmative defenses to 4SEMO's breach of contract claim at trial, and there is no evidence of any such affirmative defense.

53.     Although the Defendants' asserted at trial that they had "several defenses, including laches and prior use" to 4SEMO's trademark related claims, their affirmative defenses as plead in their response to 4SEMO's Second Amended Counterclaim did not include any claim of prior use.

54.     Further, and in any event, there was no evidence at trial of any prior use of a phrase similar to, or identical to, 4SEMO's Name Mark or Logo Mark by the Defendants.  Any and all use of a phrase similar to or identical to the Name Mark by the Defendants prior to 4SEMO's independent adoption of the Name Mark and Logo mark was the use of a phrase coined by the Grone Company, being used by or with permission of the Grone Company. To the extent there was any such use, that use inured to the benefit of the Grone Company and did not legally constitute use by Defendants.

55.     Moreover, the use of phrase similar to the Name Mark prior to 4SEMO's independent and separate adoption of the Name Mark by or for the benefit of the Grone Company did not constitute "prior use" of a trademark, or any other use, of a type sufficient to constitute a defense to the assertion of trademark rights in the Name Mark or Logo mark by 4SEMO as a matter of law.  S. Indus. v. Stone Age Equip., 12. F. Supp. 2d 796, 811 (N.D. Ill. 1998).  2 McCarthy on Trademarks § 16:9.

56.     Further, due to the fact that the evidence establishes no use of any name similar to the Name Mark by or with the permission of the Grone Company at any time between 2005 and 2012, any trademark rights of the Grone Company derived from any use prior to that time would have been abandoned as a matter of law.  5 U.S.C. § 1127; Old Dutch Foods. Inc., 477 F.2d at 153;

57.     Finally, and determinatively in any event, upon Defendants' agreement with 4SEMO to use 4SEMO's Life Saver Storm Shelters trademark and associated Greek Cross logo trademark in February of 2006, any claim of Defendants to any independent rights to those trademarks were lost and merged into the license. Y.M.C.A. v. Flint Y.M.C.A., 229 U.S.P.Q. 32, 35-36 (E.D. Mich. 1985). 3 McCarthy on Trademarks and Unfair Competition § 18:47 (4th ed.) ("Under the merger rule, if: (1) party Alpha uses the mark and later becomes a licensee of Beta under the same mark; and (2) the Alpha-Beta license ends; then (3) Alpha cannot rely upon its prior independent use as a defense against an infringement claim brought against it by Beta. Alpha's prior trademark rights were "merged" with that of Beta and inured to the benefit of Beta"); Council of Better Business Bureaus, Inc. v. Better Business Bureau, Inc., 200 U.S.P.Q. 282 (S.D. Fla. 1978); National Council of YMCA v. Flint YMCA of Flint, 229 U.S.P.Q. 32 (E.D. Mich. 1985); Kappa Sigma Fraternity v. Kappa Sigma Gamma Fraternity, 654 F. Supp.

1095, 2 U.S.P.Q.2d 1330 (D.N.H. 1987); National Council of YMCA v. Columbia YMCA, 8 U.S.P.Q.2d 1682 (D.S.C. 1988); Hot Stuff Foods, LLC v. Mean Gene's Enterprises, Inc., 468 F. Supp. 2d 1078, 1095 (D.S.D. 2006).

58.     Defendants' claim of a Laches defense was also not established at trial. To prevail on the affirmative defense of laches, Defendants would have had to prove three things: (1) that Plaintiff had actual or constructive notice of Defendant's use of Lifesaver Storm Shelters (beyond the limited permission); (2) that Plaintiff showed an unreasonable lack of diligence in taking action as to Defendant's use of Lifesaver Storm Shelters; and (3) that Defendant would be prejudiced by allowing Plaintiff to assert its rights at this time. *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792-93 (7th Cir. 2002); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455 (4th Cir. N.C. 1996).

59.     Further, the estoppel-by-laches defense arises only where the plaintiff has unreasonably delayed its pursuit of a remedy. See *Brittingham v. Jenkins*, 914 F.2d 447, 456 (4th Cir. Md. 1990).

60.     In addition, attempts to resolve a dispute without resorting to a court do not constitute unreasonable delay for determining the applicability of the doctrine of laches." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 823 (7th Cir. 1999).

61.     The evidence at trial indicates that 4SEMO did not wait an impermissible amount of time under all the circumstances before asserting its claims.  Moreover, the Defendants expressly testified that they did not change their position in any way due to any delay by 4SEMO before filing its claims, and they would not have acted differently in any manner if the claims had been asserted sooner.

62.     Defendants did not assert or litigate any other affirmative defenses during the trial of this action and, accordingly, they were waived.   To the extent they were not waived, however, they also were not established as a matter of law.

63.     Defendants' response to 4SEMO's Second Amended Counterclaim asserts a conclusory defense of Waiver or Unclean Hands.  However, "waiver is an intentional relinquishment of a known right," *Phico Ins. Co. v. Aetna Casualty and Surety Co. of America*, 93 F.Supp. 2d 982, 993 (S.D. Ind. 2000) (citations omitted), and 4SEMO never acted affirmatively to indicate that it did not own the Marks or would not enforce its rights.  The mere fact that 4SEMO did not discover that the Defendants had undertaken their scheme until 2011 is insufficient.

64.     Defendants also asserted a vague defense of "Estoppel" without explanation in their written pleadings.  Estoppel requires proof that a trademark owner was aware of the infringing conduct and yet acted in a way that induced the infringer to reasonably rely upon such action to his detriment.  See e.g. Isringhausen Imps., Inc. v. Nissan N. Am., Inc., 2011 U.S. Dist. LEXIS 140056 (C.D. Ill. Dec. 5, 2011) (in the copyright context). To assert equitable estoppel, a defendant must show that (1) plaintiff's misleading communication, with plaintiff's knowledge of the true facts, prompted the defendant to infer that the plaintiff would not enforce its rights against the defendant; (2) the defendant relied on that conduct; and (3) the defendant would be prejudiced if the plaintiff were allowed to bring suit.  Emmpresa Cubana Del Tabaco v. Culbro Corp., 213 F. Supp. 2d 247, 276 (S.D.N.Y. 2002).

65.     To the extent the estoppel defense was intended to be based on any perceived delay by 4SEMO in bringing 4SEMO's claims, the evidence does not support such a claim.  To the extent Defendants' defense was intended to address their apparent contention that 4SEMO is

estopped from asserting the Defendants acted improperly by using the Marks from 2011 until August of 2012, during the time period in which 4SEMO was acting in reliance on the Defendants' agreement to purchase the Marks from 4SEMO which the Defendants later disavowed, the Defense also fails.

66.     The agreement regarding the Defendants' purchase of the Marks from 4SEMO demonstrated that the Defendant understood the trademarks belonged to the Plaintiff.   The fact that 4SEMO did not object to Defendants' use of the Marks in reliance on that agreement, does not provide a defense for the Defendants upon their failure to honor that agreement.  Rather, it is evidence of the willful and knowing nature of their continued infringement Sarkis' Café Inc. v Sarks in the Park LLC, No. 12 C 9686, 2016 WL 723135 (ND Ill, 2016)

67.     The Defendants' had also claimed "acquiescence" in their written pleadings. "Unlike laches, acquiescence implies active consent to an infringing use of the marks and requires a defendant to establish that (1) the senior user actively represented it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 2011 U.S. Dist. LEXIS 32783, 2011 WL 1131385, at *6 (N.D. Ill. 2011); see also *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002).  Again, the evidence does not establish any legally effective consent, let alone "active consent," was given by 4SEMO to the Defendants.

68.     Defendants' also did not pursue their statute of limitations defenses at trial – with good reason.  The evidence established that 4SEMO was unaware of the conduct complained of

until 2011.  4SEMO's claims were on file as of May 29, 2013, makings it claims well within all applicable statutes of limitation.

VI.     **ORDER AND JUDGMENT**

Accordingly, upon consideration of the evidence, argument of counsel, all matters of record, and in light of the findings of fact and conclusions of law set forth above, the Court hereby ENTERS JUDGMENT as follows:

1.      Judgment is hereby entered in favor of 4SEMO.Com, Inc., and against Robert Ingoldsby, Southern Illinois Storm Shelters, Inc. and Ingoldsby Excavating, Inc., jointly and severally, on as follows:

   a.       Monetary Damages:

      i.   Judgment for damages on Counts I and III of 4SEMO.Com, Inc.'s Second Amended Counterclaim in the amount of  Thirty-Four Million, Seven Hundred and Forty-Two Thousand and Six dollars ($34, 742,006.00), being  twice the profits earned by Defendants from their wrongful use of 4SEMO's Life Saver Storm Shelters mark,  is entered against Robert Ingoldsby, Southern Illinois Storm Shelters, Inc. and Ingoldsby Excavating, Inc., jointly and severally, and in favor of 4EMO.Com, Inc. ;

      ii.   Judgment for damages on Count V of 4SEMO.Com, Inc.'s Second Amended Counterclaim in the amount of Seventeen Million three hundred Seventy One thousand and Three dollars ($17,371,003.00.), being equal to the enrichment received by the Defendants that it would be unjust for them to retain,  is entered against Robert Ingoldsby, Southern Illinois Storm Shelters, Inc. and Ingoldsby Excavating, Inc., jointly and severally,  and in favor of 4EMO.Com, Inc. ;

iii.  Judgment for damages on Count VIII of 4SEMO.Com, Inc.'s Second
Amended Counterclaim in the amount of  Twenty-six thousand nine hundred and
forty dollars ($26,940.00),  being the losses suffered by 4SEMO.Com, Inc. as a
proximate result of Defendants breach of their Dealer Agreement with
4SEMO.Com, Inc.,  is entered against Robert Ingoldsby, Southern Illinois Storm
Shelters, Inc. and Ingoldsby Excavating, Inc., jointly and severally, and in favor of
4EMO.Com, Inc. ;

iv.  Judgment for damages on Count X of 4SEMO.Com, Inc.'s Second
Amended Counterclaim in the amount of Thirty-Four Million Seven Hundred
Sixty-Eight Thousand Nine Hundred and Forty-Six Dollars ($34,768,946.00),
representing the total amounts awarded to 4SEMO.Com, Inc. for the wrongful acts
taken by and pursuant to the Defendants' Civil Conspiracy.

b.    Injunctive Relief

i.  Judgment for Injunctive relief is hereby granted in favor of 4SEMO.Com,
Inc. on Counts I, III and V of the Second Amended Counterclaim;   Robert
Ingoldsby, Southern Illinois Storm Shelters, Inc. and Ingoldsby Excavating, Inc.,
and all persons acting by, through, at the encouragement of, or due to any purported
permission or authorization from all or any of them, are hereby immediately
permanently enjoined from using, attempting to use, or assisting others in the use of
the Life Saver Storm Shelters or Greek Cross logo Marks, or any trademarks or
service marks similar thereto, including but not limited to any trademark, service
mark, trade name or other source identifier containing the words Life Saver, any

visually or phonetically similar words or marks or any variation thereof, in any form or fashion,  and are ordered to:

1. Immediately cease and desist from using the Life Saver Storm Shelters mark or any trademarks or service marks similar thereto, including but not limited to any trademark, service mark, trade name or other source identifier containing the words Life Saver, any visually or phonetically similar words or marks or any variation thereof, as all or any part of any company name or domain name,

2. Within ten days of the entry of this Judgment destroy any and all brochures, booklets, pamphlets, signs, business cards, and other documents containing any use or references to the Life Saver Storm Shelters or Greek Cross logo Mark, or any trademarks or service marks similar thereto, including but not limited to any trademark, service mark, trade name or other source identifier containing the words Life Saver, any visually or phonetically similar words or marks or any variation thereof

ii.   Within ten days of the entry of this Judgment withdraw any and all opposition to the 4SEMO trademark application pertaining to the Life Saver Storm Shelters and Greek Cross logo marks currently pending before the United States Patent and Trademark Office;

iii.   Within ten days of the entry of this Judgment, withdraw any and all applications seeking to register the Life Saver Storm Shelters mark or any

trademarks or service marks similar thereto, including but not limited to any trademark, service mark, trade name or other source identifier containing the words Life Saver, any visually or phonetically similar words or marks or any variation thereof which are pending before the United States Patent and Trademark Office or any other federal, state or local agency;

iv.   within twenty-one days of the entry of this Judgment, remove and permanently discontinue and destroy (or cause to be removed, discontinued and destroyed) all video, audio, auditory, images and labels containing, using, or being comprised of the Life Saver Storm Shelters or Greek Cross logo Mark, or any trademarks or service marks similar thereto, including but not limited to any trademark, service mark, trade name or other source identifier containing the words Life Saver, any visually or phonetically similar words or marks or any variation thereof, in any form or fashion and any press release, advertisement, television show, article or other form of publication using or referencing the Life Saver Storm Shelters or Greek Cross logo Mark, or any trademarks or service marks similar thereto, including but not limited to any trademark, service mark, trade name or other source identifier containing the words Life Saver, any visually or phonetically similar words or marks or any variation thereof, in any form or fashion,

v.   within twenty-one days of the entry of this Judgment,  remove  all references to or uses of the Life Saver Storm Shelters or Greek Cross logo Mark, or any trademarks or service marks similar thereto, including but not limited to any trademark, service mark, trade name or other source identifier containing the words Life Saver, any visually or phonetically similar words or marks or any variation

thereof, from any and all websites, Facebook pages or other social media pages owned, operated, maintained or controlled by Defendants or any person controlled by Defendants

    vi.  within twenty-one days of the entry of this Judgment, notify any and all persons to whom or which any Defendants have given authorization to use, or whom or which they have encouraged at any time to use, the Life Saver Storm Shelters or Greek Cross logo Mark, or any trademarks or service marks similar thereto, including but not limited to any trademark, service mark, trade name or other source identifier containing the words Life Saver, any visually or phonetically similar words or marks or any variation thereof , or to whom or which they have given any brochures, documents or other materials using any such marks, that such persons may not use such marks in any form or fashion, must cease any such use immediately, and must comply with terms of this Order and Judgment.

    vii.  Within twenty-one days of the entry of this Judgment, provide a detailed list of the names, addresses, phone numbers, and email addresses of all persons whom or which they have authorized or claimed to authorize to use  the Life Saver Storm Shelters or Greek Cross logo Mark, or any trademarks or service marks similar thereto, including but not limited to any trademark, service mark, trade name or other source identifier containing the words Life Saver, any visually or phonetically similar words or marks or any variation thereof, at any time within the three years immediately preceding the date of this Order and Judgment to 4SEMO.Com, Inc., by delivering such information to 4SEMO.Com, Inc.'s counsel of record in this matter within fifteen days of the date of this Order and Judgment.;

     viii.   Within twenty-one days of the entry of this judgment, instruct any and all third parties to immediately cease using any and all uses of, or references to, the Life Saver Storm Shelters or Greek Cross logo Mark, or any trademarks or service marks similar thereto, including but not limited to any trademark, service mark, trade name or other source identifier containing the words Life Saver, any visually or phonetically similar words or marks or any variation thereof ,which associate the same with Robert Ingoldsby, Southern Illinois Storm Shelters, Inc. and Ingoldsby Excavating, Inc., or any product or service sold or offered for sale by any of them;

     ix.   Within twenty-one days of the entry of this Judgment, instruct all Dealers, distributors or other persons who have storm shelters manufactured by Defendants in their possession to remove any stickers, nameplates or other materials affixing the Life Saver Storm Shelters or Greek Cross logo Mark, or any trademarks or service marks similar thereto, including but not limited to any trademark, service mark, trade name or other source identifier containing the words Life Saver, any visually or phonetically similar words or marks or any variation thereof  to any storm shelters or other products purchased from Defendants that such Dealers have not yet delivered to any of such Dealers' customers;

     x.   Within twenty-one days of the entry of this Judgment, cancel any and all advertisements, including any yellow pages' advertisements, which utilize the Life Saver Storm Shelters or Greek Cross logo Mark, or any trademarks or service marks similar thereto, including but not limited to any trademark, service mark, trade name or other source identifier containing the words Life Saver, any visually or phonetically similar words or marks or any variation thereof

    c.      Costs and Attorney's Fees

      i.  This case is found to be exceptional within the meaning of  15 USC 1117

      ii.  The costs and reasonable attorneys' fees incurred by 4SEMO.Com, Inc. in connection with the prosecution of Counts I, III and V of 4SEMO's Second Amended Counterclaim against the Defendants herein are hereby assessed against Robert Ingoldsby, Southern Illinois Storm Shelters, Inc. and Ingoldsby Excavating, Inc., jointly and severally, and awarded to 4SEMO.Com, Inc.

      iii.  The costs and reasonable attorneys' fees incurred by 4SEMO.Com, Inc. in connection with its defense of the original affirmative claims brought by Defendants in the name of Southern Illinois Storm Shelters, Inc. are hereby assessed against Robert Ingoldsby, Southern Illinois Storm Shelters, Inc. and Ingoldsby Excavating, Inc., jointly and severally, and awarded to 4SEMO.Com, Inc.

      iv.   4SEMO.Com, Inc. is ordered to file with the Court a statement of  the costs and attorney's fees it has incurred in connection with this Cause within twenty-one (21) days of the date of the entry of this Order and Judgment.

    d.      Dismissal of Withdrawn Counts

      i.  Counts II, IV, VI, VII, XI or XII of 4SEMO's Second Amended Counterclaim, which were not submitted by 4SEMO.Com at trial, are hereby dismissed.

2.    The Commissioner of the Trademark Office is hereby directed to:

    a.      Take notice of the facts, conclusions of law and judgments established by this Findings of Fact, Conclusions of Law and Order and Judgment in conjunction with

its determination of the pending trademark application of 4SEMO.Com, Inc. bearing

Application Number 85513614 and the opposition of Southern Illinois Storm Shelters

Inc. to such application, bearing filing date 10/10/2012 and ESTTA Tracking number

ESTTA499340  and

b.      Take notice of the facts, conclusions of law and judgments established by

this Findings of Fact, Conclusions of Law and Order and Judgment in conjunction with

its determination of the Trademark Application of Southern Illinois Storm Shelters, Inc.,

bearing Application Number  76712028;

3.      The Clerk of the Court is directed to

a.       enter judgment in accordance with the Court's prior rulings directed to the

affirmative claims brought by Defendants in the name of Southern Illinois Storm

Shelters, Inc. in which the Court granted 4SEMO's Motions to Strike the Damages

claims, to Dismiss Counts 3 through 7, and for Summary Judgment on Counts 1 and 2, as

SISS as previously directed by the Court in this Court's Orders of February 20, 2015

[Doc.123], August 11, 2015 [Doc.149], and August 26, 2015 [Doc. 150]

b.      enter judgment in accordance with these Findings of Fact, Conclusions of

Law and Order and Judgment, and

c.      provide a certified copy of these Findings of Fact, Conclusions of Law and

Order and Judgment to the Commissioner of the US Patent and Trademark Office for

consideration in conjunction with Trademark Applications 85513614 and 76712028

SO ORDERED AND ADJUDGED ON THIS _____ DAY OF _____ 2017,

_____

The Hon. David R. Herndon, District Judge.

47